Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAIME F.<br><br>        Petitioner,<br><br>  v.<br><br>WILLIAM BARR, *et al.*,<br><br>        Respondents. | Civil Action No. 19-20706 (ES)<br><br>OPINION |

SALAS, DISTRICT JUDGE

Petitioner Jaime F. ("Petitioner") is currently being detained by the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") at the Bergen County Jail ("BCJ") in Hackensack, New Jersey.   On April 15, 2020, Petitioner filed the instant amended petition for writ of habeas corpus under 28 U.S.C. § 2241.   (D.E. No. 11-1 ("Amended Petition" or "Am. Pet.")).   The next day, Petitioner filed a motion for a temporary restraining order (D.E. No. 14 ("TRO Motion")).   Both the Amended Petition and the TRO Motion seek immediate release from detention based on his prolonged detention and the threat of COVID-19.   (D.E. No. 14).   For the reasons stated below, the Court denies the Amended Petition and the TRO Motion.

### I.     Background

Petitioner is a native and citizen of Venezuela.   (Am. Pet. ¶ 1; D.E. No. 15-1).   On May 9, 1992, Petitioner was admitted to the United States as a non-immigrant visitor.   (D.E. No. 18-6

("Charles Decl.") ¶ 4.   On September 13, 1996, Petitioner adjusted his status to an alien lawfully admitted for permanent residence.   (*Id.* ¶ 5).

On October 12, 2010, Petitioner pleaded guilty in the Supreme Court of the State of New York, Queens County, to rape in the third degree and two counts of criminal contempt in the first degree.   (*Id.* ¶ 6).   On November 1, 2010, on the rape charge, Petitioner was sentenced to two years' imprisonment and three years of post-release supervision, and a seven-year order of protection was entered against him.   (*Id.*).   The same day he was sentenced to one year of imprisonment on each of the contempt charges.   (*Id.*).

ICE detained Petitioner on May 1, 2018.   (*Id.* ¶ 7; D.E. No. 15-2).   The same day, Petitioner was served with a Notice to Appear charging him with removability pursuant to section 237(a)(2)(A)(iii) under the Immigration and Nationality Act in that his offense of rape constituted an aggravated felony.   (D.E. No. 15-1).   On April 8, 2019, after several hearings, the immigration judge ("IJ") denied Petitioner's applications for relief and ordered him removed to Venezuela.   (Charles Decl. ¶ 8; D.E. No. 15-3).   Petitioner filed an appeal of that decision with the Board of Immigration Appeals ("BIA").   (Charles Decl. ¶ 8).   On or about August 28, 2019, Petitioner filed a motion to withdraw his appeal with the BIA.   (*Id.* ¶ 11).   On September 10, 2019, the BIA issued a decision acknowledging that Petitioner withdrew his appeal.   (*Id.* ¶ 12; D.E. No. 15-4).

On November 25, 2019, Petitioner filed his initial petition in this matter.   (D.E. No. 1 ("Petition" or "Pet.")).   He raised one claim for relief: his detention under 8 U.S.C. § 1231 violates his constitutional rights under *Zadvydas v. Davis*, 533 U.S. 678 (2001), because it has become prolonged and there is no likelihood of removal in the foreseeable future.   (*See id.*, generally).   Respondents William Barr, Susan Quintana, Chad Wolf, and Ronald P. Edwards

(collectively, "Respondents") filed an answer on March 6, 2020, and Petitioner filed a reply on March 23, 2020.   (D.E. Nos. 8 & 9).   Shortly thereafter, Petitioner filed the Amended Petition and the accompanying TRO Motion.   (D.E. Nos. 11-1 & 14).   In his Amended Petition, Petitioner raises two grounds for relief:   (i) his original claim regarding prolonged detention under § 1231 (*id.* ¶¶ 40–45); and (ii) his detention in BCJ during the COVID-19 pandemic violates his substantive due process rights in light of his underlying asthma condition (*id.* ¶¶ 46–50).

In his accompanying TRO Motion, Petitioner seeks immediate release and argues:   (i) he will suffer irreparable harm because the COVID-19 outbreak at BCJ cannot be contained; he falls into the age category of those individuals who are most likely to be infected; and his asthma puts him at higher risk of complications; (ii) he is likely to succeed on his claims that his detention is prolonged and holding him in BCJ during the pandemic violates his due process rights to be free of punishment and denies him adequate medical care; and (iii) releasing Petitioner during the pendency of his habeas case would serve the public interest and the balance of equities.   (D.E. No. 14-1 ("Mov. Br.") at 14–22).

## II.    Jurisdiction

### A.    Claims under 8 U.S.C. § 1231

Pursuant to 28 U.S.C. § 2241(c), habeas relief may be extended to a prisoner only when he "is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2241(c)(3).   Thus, a federal court has jurisdiction over such a petitioner if he is "in custody" and the custody is allegedly "in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).   The Court has subject matter jurisdiction over Petitioner's claim regarding his prolonged detention under § 1231, because Petitioner (i) was detained within its jurisdiction, by a custodian within its jurisdiction, at

Case 2:19-cv-20706-ES Document 20 Filed 05/11/20 Page 4 of 22 PageID: 948

the time he filed his Petition, *see Spencer v. Lemna*, 523 U.S. 1, 7 (1998) & *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 49–95, 500 (1973); and (ii) asserts that his detention is not statutorily authorized, *see Zadvydas*, 533 U.S. at 699.

> **B.**    **Conditions of Confinement Claims**

Traditionally, 42 U.S.C. § 1983 is the proper statute under which prisoners have asserted conditions of confinement claims.    *See e.g.*, *Camacho Lopez v. Lowe*, No. 20-563, 2020 WL 1689874, at *4–6 (M.D. Pa. Apr. 7, 2020).    Conversely, challenges to "the fact or length of confinement" are properly brought in a habeas corpus petition.    *See Tedford v. Hepting*, 990 F.2d 745, 748 (3d Cir. 1993) (quoting *Preiser v. Rodriguez*, 411 U.S 475, 494 (1973)).    Here, Petitioner seeks immediate release from ICE custody which is a remedy available through a habeas petition, not in a civil rights action.    *See, e.g.*, *Preiser*, 411 U.S. at 494; *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002).    There is currently no Third Circuit or Supreme Court decision that directly addresses whether a conditions of confinement claim may be raised in a habeas corpus petition.    *Camacho*, 2020 WL 1689874, at *5; *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241–42 (3d Cir. 2005).    However, the Supreme Court has stated that "[w]hen a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."    *Preiser*, 411 U.S. at 494; *see also Ziglar v. Abbasi*, 137 S.Ct. 1843, 1862–63 (2017).    Similarly, the Third Circuit has alluded to the possibility of a "habeas attack on the conditions of confinement," which would be "cognizable in a federal habeas action *only in extreme cases*."    *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978) (emphasis added).

After reviewing the applicable Supreme Court and Third Circuit precedent, many other courts in the Third Circuit have permitted petitioners to raise conditions of confinement challenges

through habeas petitions.    *See e.g.*, *Jorge V.S. v. Green*, No. 20-3675, 2020 WL 1921936, at *2

(D.N.J. Apr. 21, 2020); *accord Camacho*, 2020 WL 1689874, at *4–6; *Umarbaev v. Lowe*, No.

20-0413, 2020 WL 1814157, at *5 (M.D. Pa. Apr. 9, 2020).    Accordingly, the Court agrees with

the line of cases that have allowed conditions of confinement claims to proceed in habeas corpus

petitions, and will allow the Petitioner to pursue a claim challenging his conditions of confinement

in the present habeas corpus Petition.

**III.    Discussion**

   **A.    Prolonged Detention**

   The parties agree that Petitioner has a final order of removal.[1]    Once an alien has a final

order of removal, he becomes subject to the "post-order" detention provisions of 8 U.S.C.

§ 1231(a) absent a stay of removal by the Circuit Court of Appeal.    *See Zadvydas*, 533 U.S. at

682–83.    Under 8 U.S.C. § 1231(a)(1)(A), when an alien is ordered removed, the Secretary of the

Department of Homeland Security ("DHS") "shall remove the alien from the United States within

a period of 90 days."    During this ninety-day period, DHS must detain the alien.    *See* 8 U.S.C.

§ 1231(a)(2).

   In *Zadvydas*, the Supreme Court held that post-removal detention pursuant to Section

1231(a)(6) must be limited "to a period reasonably necessary to bring about that alien's removal

from the United States."    533 U.S. 678, 689 (2001).    After the six-month period, the alien bears

---

[1]       The parties disagree , however, as to how long Petitioner has been under a final order of removal for *Zadvydas*
purposes.    (*Compare* Am. Pet. ¶¶ 24–25 (citing to 8 C.F.R. § 1003.4 to argue that Petitioner has been detained under
a final order of removal since the IJ's decision on April 8, 2019, because "when an alien withdraws his appeal prior
to a BIA decision, the administrative final order of removal is the date of the Immigration Judge decision"), *with* D.E.
No. 15 ("Opp. Br.") at 14–15 (arguing that, even if 8 C.F.R. § 1003.4 retroactively placed Petitioner back under §
1231 as of the IJ's April 8, 2019 order, the time between April 8, 2019, to September 10, 2019, should not be
considered under the Court's *Zadvydas* analysis because ICE was precluded from removing Petitioner during this
period)).    The Court need not resolve this dispute because even utilizing Petitioner's timeframe, he is not entitled to
relief.

the burden of showing there is no significant likelihood of removal in the reasonably foreseeable future.  If the alien successfully makes that showing, "the Government must respond with evidence sufficient to rebut that showing."  *Id.*  Therefore, under *Zadvydas*, once the six-month period expires, an alien seeking relief must first present the Court with "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."  *Alexander v. Att'y Gen.*, 495 F. App'x 274, 276 (3d Cir. 2012) (quoting *Zadvydas*, 533 U.S. at 701).  "Where an alien meets this initial burden, the Government can establish its continued authority to detain only if the Government can rebut his evidence and show that the alien's removal remains likely in the reasonably foreseeable future."  *See Shahbaz H. v. Green*, No. 19-8052, 2019 WL 2723880, at *2 (D.N.J. July 1, 2019).

In *Guerrero-Sanchez v. Warden York Cty. Prison*, the Third Circuit held that in addition to the rights announced by the Supreme Court in *Zadvydas*, "§ 1231(a)(6) affords a bond hearing after prolonged detention to any alien who falls within the ambit of that provision."  905 F.3d 208, 211 (3d Cir. 2018).  In accordance with *Guerrero-Sanchez*, "alien[s, like Petitioner,] detained under § 1231(a)(6) [are] generally entitled to a bond hearing after six months (*i.e.*, 180 days) of custody."  *Id.* at 226.  At that hearing, the alien is entitled to release from detention unless the government establishes that the alien poses a risk of flight or a danger to the community. *Id.* at 224 (citation omitted).  Nevertheless, "'[i]f the 180-day threshold has been crossed, but the

-6-

alien's release or removal is imminent . . . [then] the government [is not] required to afford the alien a [bond] hearing before an immigration judge.'" *Id.* at 226 n.15 (citation omitted).[2]

Here, the Court finds that Petitioner is not entitled to relief on his prolonged detention claim. As initial support for the claim that he is entitled to release under *Zadvydas*, Petitioner relies on a 2017 "Presidential Proclamation Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats." (Am. Pet. ¶¶ 43–44). Specifically, he quotes a section in that proclamation entitled "Sec. 2. Suspension of Entry for Nationals of Countries of Identified Concern," which states in pertinent part, "Venezuela's government . . . has been assessed to be not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States." (Am. Pet. ¶ 43).[3] While this statement raises the *possibility* that Venezuela may not be cooperative with removals, standing alone, the Court does not find that it shows good reason to believe that there is no significant likelihood of Petitioner's removal in the reasonably foreseeable future.

The case relied upon by Petitioner for this argument supports the Court's conclusion. (D.E. No. 16 ("Reply Br.") at 2). In *Naranjo v. Spivey*, the petitioner was also challenging his prolonged detention under § 1231. No. 16-173, 2018 WL 504404, at *2–3 (M.D. Ga. Jan. 22, 2018). When attempting to meet his initial burden under *Zadvydas*, the petitioner relied on the same portion of the proclamation to show that his removal was unlikely in the reasonably foreseeable future. *Id.* at *3 ("Petitioner also notes that the Executive Branch recently labeled

---

[2] The Court notes Petitioner has not sought a bond hearing pursuant to *Guerrero-Sanchez* before the immigration court, nor does he seek a *Guerrero-Sanchez* bond hearing in his Amended Petition. Accordingly, the Court does not address whether such a hearing would be warranted here.

[3] Petitioner states that the quoted portion is from Section One of the proclamation, but it actually appears to be contained in Section Two.

Venezuela as 'not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States.'").    While the court found that Petitioner had shown good reason sufficient to meet his initial burden, it specifically stated that the proclamation "bolsters Petitioner's argument but is not dispositive."    *Naranjo*, 2018 WL 504404, at *3.    In other words, the presidential proclamation, *coupled with* the likely remaining delay in petitioner's removal proceedings *and* documented inability of the Government to obtain travel documents for the petitioner in that case, was sufficient to shift the burden to respondents under *Zadvydas*.    *Id.*    The other two elements present in *Naranjo*, remaining delay in removal proceedings and inability to obtain travel documents, are not present here.    And as the court did there, this Court does not find the statement in the proclamation dispositive.

Petitioner next generally cites to an article published on Department of State's website for the proposition that the United States and Venezuela have not had diplomatic relations since January 23, 2019.    (Am. Pet. ¶ 44 (citing *U.S. Relations with Venezuela—Bilateral Relations Fact sheet*, BUREAU OF WESTERN HEMISPHERE AFFAIRS, https://www.state.gov/u-s-relations-with-venezuela/.) (hereinafter "*U.S. Relations with Venezuela*")).[4]    The Court notes that this article does not support Petitioner's proposition, and states that "the United States maintains formal diplomatic relations with Venezuela" and that "the United States maintains diplomatic relations with Venezuela through interim President Juan Guaido and the democratically elected National Assembly."    *U.S. Relations with Venezuela*.    More importantly, Petitioner points to nothing in

---

[4]    The Court notes that Petitioner does not actually cite to any document to support this statement in the Amended Petition.    (Am. Pet. ¶ 44).    However, in his original Petition, he relies on said article as his support.    (Pet. ¶ 17, Ex. D).    The Court assumes he again relies on that article as support for this statement in his Amended Petition.

*U.S. Relations with Venezuela* to suggest that the ability of the United States to effectuate removals to Venezuela is somehow affected.

Finally, relying on a May 15, 2019 press release from DHS, Petitioner alleges that "the Department of Homeland Security has suspended all commercial flights between the United States and Venezuela as of May 15, 2019."   (Am. Pet. ¶ 44, D.E. No. 1-5);[5] *see DHS Determines that Conditions in Venezuela Threaten the Safety and Security of Passengers, Aircraft, and Crew, Requiring an Immediate Suspension of Air Transportation*, U.S. DEPARTMENT OF HOMELAND SECURITY,        https://www.dhs.gov/news/2019/05/15/dhs-determines-conditions-venezuela-threaten-safety-and-security-passengers-aircraft.   Similarly, Petitioner provides no support to show that this information is even relevant to the United States' ability to remove individuals to Venezuela and whether removal flights have been affected.

Having reviewed the support Petitioner relies on for his *Zadvydas* claim, both separately and as a whole, and none of which suggests Petitioner's removal would be delayed or affected, the Court finds that Petitioner has not met his burden under *Zadvydas* to show good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.   *See*, *e.g.*, *Joseph v. United States*, 127 F. App'x 79, 81 (3d Cir. 2005) ("Under *Zadvydas*, a petitioner must provide 'good reason' to believe there is no likelihood of removal, 533 U.S. at 701, and Alva has failed to make that showing here."); *Soberanes v. Comfort*, 388 F.3d 1305 (10th Cir. 2004) (affirming dismissal of § 2241 petition challenging detention pursuant to § 1231(a)(6) where petitioner failed to provide good reason to believe that there is no likelihood of removal); *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002) ("in order to state a claim under *Zadvydas* the

---

[5]        As with the prior argument, Petitioner does not include a citation for this statement, and it appears that he is relying on the article attached to his original Petition as Exhibit E.   (Pet. ¶ 17; D.E. No. 1-5).

alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future").

Even if the Court were to find Petitioner had met his burden to show there is good reason to believe there is no likelihood of removal, the Court finds the Government has sufficiently rebutted that evidence.   While the Court is mindful that Petitioner has been detained for a significant period of time, and indisputably for longer than the six months set forth in *Zadvydas*, the Court finds his removal is reasonably foreseeable.   In particular, shortly after Petitioner withdrew his appeal before the BIA, and ICE could commence removal, Respondents began working on obtaining travel documents.   (Charles Decl. ¶¶ 13–18).   Respondents have since obtained two sets of travel documents for Petitioner, the latest of which are valid through the middle of June.   (*Id.* ¶¶ 19–20).   Moreover, Respondents have provided a certification stating that a removal flight to Venezuela took place as recently as the end of February 2020, thereby showing removals to Venezuela in fact occurred after commercial flights were suspended on May 15, 2019.   (*Id.* ¶ 21).   Finally, the same declaration states that while travel is restricted into Venezuela until May 12, 2020, due to Venezuela's national quarantine, Petitioner is scheduled for the next available flight.   (*Id.* ¶¶ 23–24).   There are no impediments to prevent Petitioner's removal as soon as the national quarantine in Venezuela ends, and while he generally takes issue with the statements made in Mr. Charles' Declaration (Reply Br. at 1), Petitioner has pointed to no evidence to suggest otherwise.   Accordingly, the Court finds Petitioner is not entitled to relief on his claim for prolonged detention under *Zadvydas*.   *See Francis S.M. v. Decker*, No. 19-8053, 2020 WL 1956053, at *4 (D.N.J. Apr. 23, 2020) (denying relief under *Zadvydas* and also stating that "[a]lthough travel to India is currently restricted, ICE asserts that it intends to schedule

Petitioner on the earliest flight available to India."). The denial of this claim, at this time and on these facts, does not prevent Petitioner from filing an amended petition in a new case, should he be able to make the requisite showing under *Zadvydas* in the future.

### B.   Condition of Confinement Claims

Traditionally, conditions of confinement claims by sentenced prisoners arise under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 27–28 (1993). In its prohibition of "cruel and unusual punishments," the Eighth Amendment, for example, prohibits prison officials from using excessive physical force against prisoner and imposes duties on these officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Relevant to this case, courts have held that prison official must not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33–34 (noting that the Eighth Amendment requires a remedy when "inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease") (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)).

Conditions of confinement claims brought by an immigration detainee are grounded in due process under the Fifth Amendment, not the Eighth Amendment. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) ("when pretrial detainees challenge their conditions of confinement, we must consider whether there has been a violation of the Due Process Clause . . ."); *see also Zadvydas*, 533 U.S. at 690, 693. Under the Due Process clause, "a detainee may not be punished prior to an adjudication of guilt." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520 (1979)). To determine whether challenged conditions amount to punishment, courts must determine "whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not,

-11-

we may infer that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees." *Hubbard*, 538 F.3d at 232 (quoting *Bell*, 441 U.S. at 539) (internal quotation marks omitted).

Moreover, while *Helling* is a conditions of confinement claim by a sentenced prisoner, and therefore arises under the Eighth Amendment, its application of the deliberate indifference standard and reasoning are nonetheless relevant in the context of a conditions of confinement claim brought by an immigration detainee. *See, e.g.*, *United States v. Laury*, No. 17-313, 2020 WL 2036718, at *6 n.1 (M.D. Pa. Apr. 28, 2020). This is because "the Due Process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987).

Here, it is unclear if Petitioner raises a punitive conditions claim, a deliberate indifference claim, or both. Petitioner essentially asserts that "[p]lacing Petitioner in the known and avoidable mortal danger of becoming infected by COVID-19 without a sufficiently compelling justification is a violation of Mr. Franco's due process right to bodily integrity, to protection against known serious dangers, to adequate medical care, and ultimately, to life." (Am. Pet. ¶ 46). Specifically, Petitioner alleges that he is "extremely likely to be infected" as he is a 36 year-old male, who "falls within the age range and gender that make up the majority of cases in the tri-state area." (Mov. Br. at 14). Petitioner also alleges that he has a heightened risk of contracting and being severely ill from COVID-19 because he has asthma. (*Id.* at 15; Am. Pet. ¶ 47). According to Petitioner, because BCJ fails to provide Petitioner adequate care in light of his conditions and the pandemic, his continuing detention "is not sufficiently compelling or narrowly tailored to serve a legitimate government interest." (Mov. Br. at 19).

Because the Third Circuit and Supreme Court have yet to provide judicial guidance on how

to navigate these claims in light of the unprecedented pandemic, the Court notes that there have been varying opinions among federal district courts throughout the country.[6]   In this context and in the wake of COVID-19, the Court considers Petitioner's habeas corpus Petition and TRO Motion with the utmost gravity.   For the reasons that follow, the Court finds that Petitioner fails to establish a punitive conditions of confinement claim or a deliberate indifference claim, and thus is not entitled to release based on COVID-19.

### 1)   *Deliberate Indifference Claims*

To establish a claim for deliberate indifference to medical needs under the Due Process Clause, Petitioner must show that (i) he has a serious medical need; and (ii) that the acts or omissions by BCJ officials were deliberately indifferent to Petitioner's medical need.   *See, e.g.*, *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159–60 (3d Cir. 2017).   The Supreme Court has stated that deliberate indifference to a prisoner's medical needs exists only if "the official knows of and disregards an excessive risk to inmate health or safety."   *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   While deliberate indifferent claims cannot be denied merely "on the ground that the complaining inmate shows no serious current symptoms," *Helling*, 509 U.S. at 33, Petitioner must show that the officials were "both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . dr[e]w th[at] inference."   *Natale*, 318 F.3d at 582.

---

[6]     *Compare Cristian A.R. v. Decker*, No. 20-3600 (D.N.J. Apr. 12, 2020); *Rafael L.O. v. Decker*, No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020), *with Graham v. Decker*, No. 20-2423, 2020 WL 1847568, at *4 (S.D.N.Y. Apr. 13, 2020); *Umarbaev v. Lowe*, No. 20-00413, 2020 WL 1814157 (M.D. Pa. Apr. 9, 2020); *Lopez v. Lowe*, No. 20-563, 2020 WL 1689874 (M.D. Pa. Apr. 7, 2020); *Sacal-Micha v. Longoria*, No. 20-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020); *Dawson v. Asher*, No. 20-409, 2020 WL 1304557 (W.D. Wa. Mar. 19, 2020).

As mentioned above, it is unclear if Petitioner even raises a deliberate indifference claim, other than citing to cases that were decided based on a finding of deliberate indifference.   (*See* Mov. Br. at 15 & 17).   Out of an abundance of caution, Court assumes that such claim is raised and will address it on the merits.   The parties do not dispute that Petitioner suffers from chronic asthma.   (Am. Pet. ¶ 47; Mov. Br. at 2; D.E. No. 18 ("Gov. Supp. Br"). at 2).   However, the medical condition does not, by itself, compel release under the deliberate indifference standard.   Rather, Petitioner must demonstrate that Respondents knew of a substantial risk to the Petitioner on the basis of his medical needs, and that Respondents failed to take adequate preventative measures to combat the spread of COVID-19 in light of those needs.   *See Farmer*, 511 U.S. at 837.   Based on the facts before this Court, Petitioner has failed to meet his burden.

Petitioner alleges that his inhaler "was not refilled by BCJ staff" at or around mid-March and that "he was told this was because he was not a 'priority.'"   (D.E. No. 14-2 ("Goldman Declaration" or "Goldman Decl.") ¶ 2(C)).[7]   However, Petitioner's medical records shows that, on March 28, 2020, Petitioner made a sick call, during which he requested an inhaler.   (D.E. No. 18-1 at USA_000008).   The nurse who answered Petitioner's call assessed Petitioner's medical condition and concluded that Petitioner "stood at ease" with "even non-labored breathing" and talked "with no difficulties/distress."   (*Id.*).   The nurse also provided education to Petitioner

---

[7]     Petitioner filed no supporting document with his Amended Petition regarding his conditions of confinement claim.   Instead, Petitioner filed a declaration pursuant to 28 U.S.C. § 1746 by his counsel, Mr. Michael Z. Goldman, declaring "[u]pon information and belief, with the source of the information being [Petitioner]."   (Goldman Decl.). Pursuant to Local Civil Rule 7.2(a), "[a]ffidavits, declarations, certifications and other documents of the type referenced in 28 U.S.C. § 1746 shall be restricted to statements of fact within the personal knowledge of the signatory." Thus, the Goldman Declaration, which attests to facts not within Mr. Goldman's personal knowledge, is insufficient to meet the requirement of Local Civil Rules 7.2(a) and 65.1(a), and this procedural deficiency precludes granting emergency relief.   *See Bryant v. Nolan*, No. 09-2672, 2009 WL 2843902, at *2 (D.N.J. Sept. 1, 2009); *see also* L. Civ. R. 65.1(a).   However, given the unprecedented circumstances in the wake of COVID-19, the Court will consider the Goldman Declaration for the Petition.

regarding "how to contact medical," to which Petitioner responded with "verbalized understanding." (*Id.*). Finally, the nurse told Petitioner that he "may come to medical for [a] nebulizer treatment if needed." (*Id.*). Four days later, on April 1, 2020, Petitioner made another sick call regarding unrelated medical conditions and did not appear to make any asthma related complaints or requests. (*Id.* at USA_000005). On April 9, 2020, a week before Petitioner filed the instant Amended Petition and the TRO Motion, the requested inhaler refill was added as a new medication for Petitioner. (*Id.* at USA_000004). The parties do not dispute these facts. (*See* Gov. Supp. Br. at 2; D.E. No. 19 ("Pet. Supp. Br.") at 3 n.2). Based on the undisputed record, the Court finds that Petitioner fails to establish that his asthma, in and of itself, imposes a "serious medical need" that causes "excessive risk to [Petitioner's] health or safety" such that the assessment and treatment Respondents provided amount to deliberate indifference. *See Natale*, 318 F.3d at 581–82; *Farmer*, 511 U.S. at 837. A deliberate indifference claim requires a showing of a "reckless[] disregard [of] a substantial risk of serious harm." *Giles v. Kerney*, 571 F.3d 318 (3d Cir. 2009). This burden is not met here with regard to the medical attention Petitioner received for his asthma. *See Pearson v. Prison Health Service*, 850 F.3d 526 (3d Cir. 2017) ("when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care."); *see also Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) (explaining that deliberate indifference requires something "more than negligence").

Moreover, given the various measures implemented in BCJ to combat the spread of COVID-19, as discussed below, and the fact that Petitioner continues to receive reasonable treatment for his asthma, the Court does not find that the officials at the BCJ are deliberately indifferent to Petitioner's medical needs in light of the COVID-19 pandemic. Petitioner

repeatedly alleges that, because BCJ is "densely populated," social distancing is impossible at BCJ. (Goldman Decl. ¶ 2(E); Mov. Br. at 12, 16 & 19; Reply Br. at 6).   However, evidence submitted by Respondents paints a different picture.[8]   For example, while BCJ has a maximum capacity to house 1200 inmates and detainees, as of April 27, 2020, the facility houses a total of 385 inmates and detainees, of whom 156 are ICE detainees and 229 are county inmates.   (Ahrendt Decl. ¶ 4). ICE detainees and county inmates are housed separately, with ICE detainees being housed in five housing units.   (*Id.* ¶ 5).   Each cell measures 10' x 7' and contains two beds in a bunk-bed style. (*Id.* ¶ 6).   All detainees remain in their cells 23 hours a day.   (*Id.* ¶ 9(f)).   While Petitioner argues that "[s]ocial distancing is physically impossible in detainees' cells," and that "detainees live, sleep, and use the bathroom in close proximity with others," he does not claim that he has a cellmate.   (*See* Am. Pet. ¶ 37; Reply Br. at 6).   Petitioner also alleges that "the dormitory spaces are shared by dozens and [are] also used to eat meals."   However, according to the Ahrendt Declaration, all feeding is done inside the cells; and, during the one hour detainees are allowed outside of the cell area, only six detainees are permitted to leave at any given time, who share 2,643 square feet of space that includes showering facilities.   (Ahrendt Decl. ¶¶ 9(f), (l)). Petitioner, again, did not dispute any of these statements in his supplemental brief.   (*See* Pet. Supp. Br.).   The Court thus is not persuaded that social distancing is impossible at BCJ.   (*See* Mov. Br. at 19).

---

[8]     Petitioner filed the Amended Petition and the TRO Motion on April 15, 2020, and April 16, 2020, respectively.   (D.E. Nos. 12 & 14).   Respondents filed Warden Steven Ahrendt's declaration ("Ahrendt Declaration" or "Ahrendt Decl.") on April 30, 2020, and the Ahrendt Declaration is dated April 27, 2020.   (D.E. No. 18-7).   To the extent that statements made in the Ahrendt Declaration are inconsistent with Petitioner's allegations, and to the extent that Petitioner does not dispute these statements of fact in his supplemental brief ("Pet. Supp. Br."), the Court assumes that the preventative measures implemented in BCJ have been updated since Petitioner filed his Amended Petition and TRO Motion.

Petitioner also argues that BCJ lacks "the basic necessities of sufficient sanitation."   (Am. Pet. ¶ 37; *see also* Mov. Br. at 16).   For example, Petitioner alleges that he does not have access to sanitizing materials.   (Reply Br. at 8).   He also alleges that, "in addition to a lack of soap, the telephone units used by all detainees to call their families are not regularly sanitized."   (Am. Pet. ¶ 37).   These hygiene measures also have apparently been updated.   Currently, all housing units are sanitized no less than four times per day, including cleaning conducted by additional staff working through the late-night hours.   (Ahrendt Decl. ¶ 9(l)).   BCJ also provides disinfectant spray, hand sanitizer, and soap in every housing unit.   (*Id.* ¶ 9).   In addition, all staff members wear facial masks while inside BCJ.   (*Id* ¶ 9(e)).   Inmates and detainees are similarly provided with surgical facial masks, which are worn when the individuals are out of their cells.   (*Id.* ¶ 9(n)).

The Court also notes that, contrary to Petitioner's assertions (Reply Br. at 6), BCJ keeps individuals who are confirmed positive for COVID-19 in isolation and does not house them with symptomatic but unconfirmed individuals.   (*See* Ahrendt ¶¶ 9(b) & (i)).   While confirmed and unconfirmed individuals are housed in the same housing unit and away from the general population, each individual is isolated in an individual cell.   (*Id.* ¶ 9(i)).   The confirmed positives are housed on one side of the housing unit and the suspected positives are housed on the other end of the housing unit, and the two groups are separated by approximately 30-40 feet in distance.   (*Id.* ¶ 9(i)).   Moreover, following the Center for Disease Control and Prevention's guidelines for correctional facilities with detainees or inmates who exhibit symptoms of COVID-19, BCJ may transport them to local hospitals for medical evaluation.   (*Id.* ¶ 9(h)).   With detainees and inmates who had a known exposure to a confirmed case of COVID-19 but are asymptomatic, they are cohorted with other asymptomatic and unconfirmed individuals for 14 days.   (*Id*. ¶ 9(j)).

-17-

While the Court is alarmed by the fact that twenty-one corrections police officers and three nurses who work at BCJ have tested positive for COVID-19, the Court notes that among the detainee population, to which Petitioner belongs, only two ICE detainees have tested positive since the first positive case was identified on March 24. (*Id.* ¶ 9(o); *see also* Mov. Br. at 2 n.1). Thus, based on the precautionary measures BCJ has taken, and, as discussed above, the medical assessment and treatment BCJ provided to Petitioner for his asthma, the Court finds that Petitioner fails to establish that BCJ has been deliberately indifferent to Petitioner's needs in light of the pandemic.

### 2) *Punitive Conditions of Confinement Claims*

At the outset, the Court notes that Petitioner applied the wrong legal standard for his conditions of confinement claims, and none of the cases Petitioner relies on support his argument that his detention must be "sufficiently compelling or narrowly tailored to serve a legitimate government interest and intent." (Mov. Br. at 19). Petitioner cites to *Reno v. Flores*, where the Supreme Court states:

> Respondents' "substantive due process" claim relies upon our line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of "due process of law" to include a substantive component, which forbids the government to infringe certain "fundamental" liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.

507 U.S. 292, 301–02 (1993) (citing to *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992); *United States v. Salerno*, 481 U.S. 739, 746 (1987) & *Bowers v. Hardwick*, 478 U.S. 186, 191 (1986)); (*see* Mov. Br. at 16 & 19). Not only is this discussion clearly dicta, *Reno* itself applied "rational basis" standard on government custody of juvenile detainees and held that

> [w]here a juvenile has no available parent, close relative, or legal guardian, where the government does not intend to punish the child,

> and where the conditions of governmental custody are decent and humane, such custody surely does not violate the Constitution.   It is *rationally connected to a governmental interest* in "preserving and promoting the welfare of the child," and is not punitive since it is not excessive in relation to that valid purpose.

507 U.S. at 303 (emphasis added and internal citation omitted).   Similarly, none of the district court decisions relating to the COVID-19 pandemic Petitioner relies on applied the "narrowly tailored" standard to the detainees' or inmates' punitive conditions of confinement claims.   (*See* Mov. Br. at 19).

Rather, the law is settled that, "in evaluating whether a pretrial detainee's conditions of confinement violate his substantive due process rights, 'the proper inquiry is whether those conditions amount to punishment of the detainee.'"   *Umarbaev*, 2020 WL 1814157, at *6 (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)); *see also Stevenson v. Carroll*, 495 F.3d 62, 67 (3d Cir. 2007).   A "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose."   *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68).   Courts' "inquiry into whether given conditions constitute 'punishment' must therefore consider 'the totality of circumstances within an institution.'" *Hubbard*, 399 F.3d at 160 (quoting *Union Cty. Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir. 1983)).

Petitioner does not argue, nor could he, that Respondents have an express intent to punish him.   Petitioner also does not dispute that the government has a legitimate interest in ensuring that Petitioner does not flee or endanger the community, especially given Petitioner's criminal history, and the fact that he is ordered to be removed and subject to mandatory detention pursuant

to 8 U.S.C.§ 1231(a).   The sole issue before the Court is, given Petitioner's medical conditions and the ongoing COVID-19 pandemic, whether Petitioner's conditions of confinement are excessive in relation to the government's valid interest.

The Court finds that Petitioner's conditions of confinement do not rise to the level of undue punishment.   In making this decision, the Court does not take lightly the seriousness of the ongoing pandemic and the fact that asthma may make an individual more susceptible to severe illness from COVID-19.   However, it cannot be denied, as discussed at length above, that BCJ has taken various preventative measures to combat the spread of COVID-19.   Because of these efforts, BCJ has, as of April 27, 2020, three confirmed positive cases and three suspected cases, among about 385 inmates and detainees.   (Ahrendt Decl. ¶ 9(o)).   To meet their constitutional obligations, Respondents' preventative measures need not guarantee the status quo of Petitioner's health or that he will never contract the virus.   *See Jorge V.S.*, 2020 WL 1921936, at *3 (citing *Sacal-Micha v. Longoria*, No. 20-37, 2020 WL 1518861, at *6 (S.D. Tex. Mar. 27, 2020)).   Nor does the immigration detention need to be narrowly tailored to achieve a legitimate government interest.   *Reno*, 507 U.S. 301–03.   Rather, Petitioner needs to establish that his current conditions of confinement, in light of the pandemic and his underlying medical condition, are "rationally related to a legitimate non-punitive government purpose."   *Bistrian*, 696 F.3d at 373. Given BCJ's current measures to combat the spread of COVID-19 and the medical treatment it provided to Petitioner regarding his asthma, in light of the legitimate government interest to ensure Petitioner will be available on next available flight to Venezuela, the Court concludes that

-20-

Petitioner is not subject to punitive conditions of confinement.

### C. Temporary Restraining Order

Requests for preliminary injunctions and temporary restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1. To obtain a temporary restraining order, the moving party must show: "(l) a likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) 708; *accord New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385–86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001)). The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. *Id.* at 176, 179.

For the same reasons the Court denies the Petition, the Court finds that Petitioner fails to show a likelihood of success on the merits for his prolonged detention claim, as well as his conditions of confinement claims. Indeed, because the Court denies the Amended Petition, Petitioner's TRO Motion is denied as moot. *See Senad M. v. Ahrendt*, No. 19-17536, 2020 WL 1969894, at *3-4 (D.N.J. Apr. 24, 2020) (denying a preliminary injunction motion when petition is denied on merits).

## IV. Conclusion

For the reasons discussed above, Petitioner's Amended Petition and TRO Motion are

DENIED.    An appropriate order follows.


*s/Esther Salas*
**Esther Salas, U.S.D.J.**